UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10108-RGS

BRUCE EVANS and BRIDGITT EVANS

v.

DAIKIN NORTH AMERICA, LLC, DAIKIN APPLIED AMERICAS, INC.,
and DACA DELAWARE DISSOLUTION TRUST as Successor-In-Interest to
DAIKIN AC (AMERICAS) INC.

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

February 4, 2019

STEARNS, D.J.

Bruce and Bridgitt Evans brought this lawsuit in Suffolk Superior Court against Daikin North America, LLC (Daikin NA), and Daikin Applied Americas, Inc. (Daikin AA), for damages caused by an allegedly defective HVAC system.[1] Defendants subsequently removed the case to the federal district court on diversity grounds.[2] The Amended Complaint sets out three

---

[1] In their Amended Complaint, the Evans added DACA Delaware Dissolution Trust (DACA Trust) as a defendant.

[2] The Evans are residents of Massachusetts. Daikin AA is a Delaware corporation with a principal place of business in Minnesota. Daikin NA is a Delaware LLC with a principal place of business in Texas. Its sole member is a Delaware corporation with a principal place of business in Texas. Not. of Rem. (Dkt # 1) ¶¶ 10-13. DACA Trust is a statutory trust organized under

claims: breach of express and implied warranties (Count I); negligent misrepresentation (Count II); and intentional misrepresentation (Count III). Defendants now move for summary judgment on all counts.³ For the reasons to be explained, Daikin AA and Daikin NA's motions for summary judgment will be allowed, while DACA Trust's motion will be denied, except for the Count I claims of breach of express warranty and breach of implied warranty of fitness for a particular purpose, which will be allowed.

## BACKGROUND

The facts, viewed in the light most favorable to the Evans as the nonmoving party, are as follows. In 2008, the Evans began renovating their home at 7 Commonwealth Avenue in Boston, Massachusetts. In 2009, as part of the renovation, the Evans purchased a Daikin VRV III heating and cooling system, which included twenty-one indoor fan coil units (FCUs) and two compressors.⁴ The coils are composed of copper coils, aluminum fins,

---

Delaware law "to preserve and administer the rights and assets of Daikin AC (Americas) Inc. [(DACA)] and DACA Trust." Answer (Dkt # 23) ¶ 4.

³ DACA Trust and Daikin NA filed jointly, while Daikin AA filed separately and later joined their motion. *See* Joinder (Dkt # 81).

⁴ The Evans purchased the system from Stebbins-Duffy, Inc. Daikin AA Stmt of Facts (ASOF) (Dkt # 70-1) ¶ 22.

and galvanized header plates.[5] A non-conductive Styrofoam drain pan sits beneath to collect water that drips from the coils.

The Evans hired Allied Consulting Engineering Services, Inc., as their HVAC engineer. Allied coordinated with the Evans' architect, Dell Mitchell Architects, to engineer and design the HVAC system. With assistance from the general contractor, M.F. Reynolds, Inc., the subcontractor, North Mechanical Services, Inc., installed the system.

In 2015, the Evans began experiencing problems with the HVAC coils. They bought replacement coils from Daikin NA and replacement components from Daikin AA, after its technicians inspected the system. They also hired New England Cooling Towers (NECT) to install shutoff valves, which allowed them to isolate individual coil failures without affecting the entire system.

On December 21, 2016, the Evans initiated this lawsuit. They allege that the HVAC system was defectively designed because the coils were susceptible to premature corrosion.[6]

---

[5] Daikin Industries, Ltd., a non-party to this case, manufactured the coils. DACA, succeeded in interest by DACA Trust, provided a one-year warranty for the coils.

[6] That is the conclusion of their proffered expert, Dr. Thomas Eagar, who is a Professor of Materials Engineering and Engineering Management at the Massachusetts Institute of Technology (MIT), where he received his

**DISCUSSION**

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

*Piercing the Corporate Veil*

As a preliminary matter, the Evans contend that all three defendants are liable for claims stemming from the sale of their HVAC system. While DACA Trust concedes that it provided a one-year warranty on the HVAC coils, Daikin AA and Daikin NA dispute their role in the sale. The Evans maintain that Daikin AA can be held liable for the sale because it "directed" Stebbin-Duffy's sale of the system. Opp'n (Dkt # 87) at 1. Specifically, it

---

bachelor's and doctorate of science degrees in Metallurgy and has taught for over forty years. Daikin NA and DACA Stmt of Facts (NSOF) (Dkt # 73), Ex. U at 1.

"employed Stebbins-Duffy as a manufacturer's representative; distributed components of the VRV III system to Stebbins-Duffy for sale to the plaintiffs; and compensated Stebbins-Duffy based on its sale of the VRV III system." *Id.* at 6. However, as Daikin AA points out, it did not manufacture, distribute, or sell the Evans' HVAC system. Further, Stebbins-Duffy had contracted with F.W. Webb Company to supply Daikin products.[7] Daikin NA, for its part, did not exist until 2013, four years after the Evans purchased their HVAC system. NSOF (Dkt # 62) ¶¶ 17, 22.

The Evans counter that they are entitled to pierce the corporate veil and treat the Daikin defendants "as one, intermingled corporation" because, among other things, Michael Hastings, a Field Support Manager at Daikin NA, testified that DACA is not a corporation separate from Daikin NA, that DACA and Daikin NA have the same website, and that Daikin AA is a representative of Daikin NA.[8] Opp'n (Dkt # 72) at 17-20. They rely on *Brown*

---

[7] Daikin AA also asserts that it, like Daikin NA, was not incorporated until 2013, four years after the Evans purchased their HVAC system. ASOF (Dkt # 70-1) ¶ 34. The Evans, however, seek to strike Daniel Donoghue's affidavit supporting that proposition under Fed. R. Civ. P. 37 because Daikin NA "failed to disclose [his] testimony during discovery." Opp'n (Dkt # 87) at 13. Daikin AA responds that this request "is unsupported and not properly before the court." Reply (Dkt # 93) at 9. The court need not rely on this affidavit, so it does not reach this issue.

[8] Defendants objected to deposition questions regarding their relationship to one another. Counsel for the Evans acknowledged at the

v. *Daikin Am. Inc.*, 756 F.3d 219 (2d Cir. 2014), where the court made note of the intermingling of Daikin corporations. Opp'n (Dkt # 72) at 18. They also cite Daikin AA's joinder motion as evidence of the "blurred distinction" among defendants. Opp'n (Dkt # 87) at 11.

A basic tenet of corporation common law is that corporations are separate and distinct entities, whatever the relationships that may exist between or among them. *Scott v. NG U.S. 1, Inc.*, 450 Mass. 760, 766 (2008). Massachusetts is especially strict in respecting the corporate form. *Birbara v. Locke*, 99 F.3d 1233, 1238 (1st Cir. 1996). Under Massachusetts law, "[a] veil may be pierced [only] where the parent exercises 'some form of pervasive control' of the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the intercorporate relationship.'" *Scott*, 450 Mass. at 767, quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968).

Here, even accepting Hastings' testimony in its entirety, there is insufficient evidence to overcome the reluctance of the Massachusetts courts

---

outset of Hastings' deposition that "[t]o the extent he cannot answer them . . . we have agreed to subsequently handle [them] by written interrogatory." NSOF (Dkt # 86), Ex. 4 at 219:9-12. Defendants argue that the Evans cannot now rely on his testimony because they never submitted the interrogatories. Reply (Dkt # 85) at 10. The court need not reach this issue for the reasons that follow.

to authorize a piercing of the corporate form. *See Spaneas v. Travelers Indemnity Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form."). Although the Evans accurately list the twelve factors that Massachusetts courts consider when evaluating an attempt to pierce the corporate veil, *see* Opp'n (Dkt # 72) at 17-18; *see also Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (describing the twelve factors), they do not apply them to the facts here. Instead, they reaffirm their reliance on the Second Circuit's decision in *Brown*, where the court held that the plaintiff's employment discrimination claim sufficiently alleged that Daikin America, Inc., and Daikin Industries, Ltd., were his joint employer because they "conducted interrelated operations, had common ownership, and were subject to centralized control of labor relations." 756 F.3d at 228. But the Evans' reliance is misplaced. *Brown* necessarily applied New York and not Massachusetts law; involved two different Daikin entities that were in a parent-subsidiary relationship (not the constellation of three subsidiaries here); and applied the "single-employer test" under Title VII, and not a veil-piercing test similar to the one adopted in Massachusetts. *Id.* at 226-227. In short, the Evans have been unable to produce enough evidence to pierce the corporate veil. Therefore, before proceeding to the

7

merits of each claim, the court concludes that only DACA Trust, as trustee for DACA, can be held liable for alleged warranties and representations relating to the sale of the HVAC system.[9] *See* NSOF (Dkt # 62), Ex. A ¶ 12 ("DACA is the only entity to provide a warranty to Plaintiffs.").

***Breach of Express Warranty***

An express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Mass. Gen. Laws ch. 106, § 2-313(1)(a). The Evans allege that defendants breached a number of express warranties, including that the HVAC system could "be installed practically anywhere," could "perform flawlessly in any climate," and came with "one of the best warranties in the business." NSOF (Dkt # 73) ¶¶ 68-69, 76. But DACA Trust, for its part, is not liable for any express warranty claim because the warranty on the coils was for one year and it had long expired (the Evans

---

[9] While the Evans aver that Daikin AA "directed Stebbins-Duffy to provide plaintiffs' contractors with brochures containing material misrepresentations and express warranties," Opp'n (Dkt # 87) at 7, the relevant two brochures in the record are labeled as "Daikin AC," supporting the reasonable inference that DACA, not Daikin AA, produced them. *See* ASOF (Dkt. # 88), Ex. R.

8

do not allege any problems with their 2009 HVAC system prior to 2015).[10]
*See Cook v. Cullen*, 2007 WL 4946161, at *4 (Mass. Super. 2007) (finding that a plaintiff's breach of express warranty claim "was barred by the one-year restriction stated in the warranty"); *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 371 (D. Mass. 1991) ("Having determined that the warranty had already expired at the time of the crash, it is clear that plaintiff's claims based on express warranty are barred absent evidence that the one year durational limitation was inapplicable.").

### *Breach of Implied Warranty of Merchantability*

A seller breaches its warranty obligations when a product that is "defective and unreasonably dangerous" for the "ordinary purposes" for which it is intended causes injury. *Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 746 (2006) (citations omitted). Under Mass. Gen. Laws ch. 106, § 2-314, a plaintiff bears the burden of proving "a defect in the product or an unreasonably dangerous condition which existed at the time the product left the [manufacturer's] control." *Enrich v. Windmere Corp.*, 416 Mass. 83, 89 (1993). "Warranty liability may be premised either on the failure to warn . . .

---

[10] Having so concluded, the court need not reach DACA Trust's alternative argument that it is not liable because the express warranty excluded coverage for "corrosive environments." Mem. (Dkt # 61) at 9.

or, as here, on defective design." *Haglund*, 446 Mass. at 747 (citation omitted).

In evaluating the adequacy of a product's design, the fact-finder is to consider "'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'" *Back v. Wickes Corp.*, 375 Mass. 633, 642 (1978), quoting *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 431 (1978). "An essential element of such a design flaw claim is that there be a safer alternative design." *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 26 (1st Cir. 2004). "[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Uloth v. City Tank Corp.*, 376 Mass. 874, 881 (1978).

Here, the Evans allege that defendants breached the warranty of merchantability by selling a defectively designed HVAC system and replacement coils. In his report, Dr. Eagar opines that "[t]he cause of the corrosion failure is the unit design and manufacturing introducing dissimilar metals into a continually wet environment." NSOF (Dkt # 73), Ex. U at 14.

He contends that the installation of a pump "to periodically empty the catch basin" in the Styrofoam drain pan was inadequate because "the pump cannot drain the basin dry and some moisture is always present during the air conditioning season," which, in turn, creates "an ideal environment for accelerated corrosive attack." *Id.* at 13.

Defendants counter that HVAC systems function by definition in a "continually wet environment." They instead identify improper installation as the actual cause of the premature corrosion. They rely on the report of their expert, Engineering Systems, Inc. (ESI), and its conclusion that "the few failures detected within the FCUs . . . resulted from environmental exposure and not from Daikin's design and manufacturing."[11] NSOF (Dkt # 62), Ex. J at 48. Proper installation requires insulation and ductwork, including both supply and return ducts.[12] However, Allied and Dell Mitchell

---

[11] Defendants also note that Evans' original expert, Altran, reached the same conclusion that "[t]he root cause of failure for these fan-cooled units is likely environmental, not process-related." NSOF (Dkt # 62) ¶ 48. Altran opined that while "[t]he analysis did not reveal any manufacturing defects or deficiencies," "localized damage . . . may indicate a combination of conditions in this area such as environment and operating conditions led to the failures." *Id.* Defendants, in turn, argue that this report should be binding on the Evans because Altran conducted "destructive testing," which allegedly led to "substantial spoliation of key evidence." Opp'n (Dkt # 61) at 5. The court disagrees that this report is binding.

[12] The supply duct blows air into the room from the FCU, while the return duct returns air from the room to the FCU.

11

did not design, nor did North Mechanical Services install, return ducts in several areas of the property. Without return ducts, return flows are pulled through open spaces between the floors and ceilings. *Id.*, Ex. G at 30:1-31:24. The coils are thereby subjected to corrosive agents, including sulfur from the drywall and other "contaminants from construction materials." *Id.*, Ex. J at 3.[13] Defendants also point out that two FCUs in the Evans' kitchen were improperly stacked on top of each other, NSOF (Dkt # 62), Ex. V, that the HVAC system worked for the first six years, and that the "replacement rate of the coils in question is vanishingly low," Reply (Dkt # 85) at 1. *See Miller v. J & Q Auto., Inc.*, 2010 Mass. App. Div. 41 (Dist. Ct. 2010) ("A breach of the implied warranty of merchantability requires proof that the vehicle was defective at the time of sale, and the mere later appearance of a defect is not such proof.").

The Evans also rely on Dr. Eagar's opinion in offering an alternative feasible design for the HVAC system. Dr. Eagar states that "[b]etter draining design would have greatly extended the life of these units." NSOF (Dkt # 73), Ex. U at 14. He contends that had defendants used a metal drain pan similar to one Mitsubishi uses in its units, instead of one made of Styrofoam, the

---

[13] Dr. Eagar, however, asserts that "[t]here is no scientific basis for the statement made by Daikin that drywall will cause pitting of copper." NSOF (Dkt # 73), Ex. W ¶ 12.

HVAC system would have been "much more effective in allowing the corrosion electrons to exit the unit without causing further damage." *Id.*, Ex. W ¶ 9.[14] Defendants, for their part, point out that a vast majority of FCUs are composed of the same combination of materials as Daikin's. NSOF (Dkt # 62) ¶ 5. But ultimately, whether Dr. Eagar's contentions are to be credited is a question of fact to be resolved by the jury. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

That said, the Evans' primary claim, as supported by their expert, is that the HVAC system was defectively designed. This necessarily implicates DACA Trust, but it does not involve Daikin NA or Daikin AA. Nor does Dr. Eagar's report support the Evans' additional claim that Daikin NA and Daikin AA breached the warranty of merchantability by selling defectively designed replacement coils. *See Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) ("Although we will draw all reasonable inferences in the

---

[14] The court recognizes that this exhibit, Dr. Eagar's Affidavit, was not signed "under penalty of perjury that . . . [its contents were] true and correct" per 28 U.S.C. § 1746, but elects to consider it as a supplement to his report for purposes of summary judgment.

nonmovant's favor, we will not 'draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'") (emphasis in original), quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). While Dr. Eagar found that the coils corroded prematurely, he traced the problem to the Styrofoam drain pan, not the coils themselves.[15] Neither Daikin NA nor Daikin AA can, therefore, be held liable for breach of implied warranty of merchantability.

DACA Trust further argues that it did not breach any implied warranties because any such warranties were conspicuously disclaimed in the express warranty.[16] *See Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 739 (2000) ("[A] warranty of merchantability is implied in the sale of goods by a merchant unless properly disclaimed."), citing Mass. Gen. Laws ch. 106, § 2-314(1). However, Mass. Gen. Laws ch. 106, § 2-316A

---

[15] Further, while the Evans assert that Daikin's NA's replacement coils failed, neither the citations nor the evidence supports that assertion. *See* Opp'n (Dkt # 72) at 4. Similarly, there is no evidence that the spare parts provided by Daikin AA failed or were defective. *See* Reply (Dkt # 93) at 4-5.

[16] The express warranty provides in capital letters that it "IS THE SOLE AND EXCLUSIVE WARRANTY FOR [DACA TRUST], AND IS IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, IN LAW OR IN FACT" and "SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR USE OR PURPOSE." NSOF (Dkt # 62), Ex. M at 5.

prohibits a seller of consumer goods from "exclud[ing] or modify[ing] any implied warranties of merchantability and fitness for a particular purpose." Defendants contend that this section is not applicable because "a custom-built HVAC system purchased, designed, and installed by professionals is 'equipment,' not a 'consumer good.'" Reply (Dkt # 85) at 4.[17] I disagree.

Consumer goods are those "used or bought for use primarily for personal, family, or household purposes." Mass. Gen. Laws ch. 106, § 9-102. Equipment indicates "goods other than inventory, farm products, or consumer goods." *Id.* Here, the HVAC system is a consumer good because the Evans purchased it to heat and cool their home. *Compare Jacobs v. Yamaha Motor Corp., U.S.A.*, 420 Mass. 323, 328 (1995) (finding that a plaintiff's motorcycle was a consumer good), *with Baba v. Hewlett Packard Co.*, 2012 WL 5336971, *5 (N.D. Cal. 2012) (applying Massachusetts law and holding that the plaintiff's laptop was equipment, not a consumer good,

---

[17] Defendants also contend that § 2-316A does not apply because the disputed sale was "a commercial transaction," *Theos & Sons*, 431 Mass. at 738 n.2, among corporations: DACA, North Mechanical Services, and Allied, the latter two of which are listed as the HVAC purchaser or customer on various materials. NSOF (Dkt # 86), Exs. 5-9. But in *Theos & Sons*, the Supreme Judicial Court went on to explain that § 2-316A was inapplicable because "[t]he sale was a commercial transaction between two corporations *and did not involve consumer goods.*" 431 Mass. at 738 n.2 (emphasis added). Therefore, the only relevant inquiry is, as discussed above, whether the Evans' HVAC system is a consumer good.

15

because it was used for "business purposes"). DACA Trust's disclaimer of any implied warranties is therefore unenforceable.

### *Breach of Implied Warranty of Fitness*

The warranty of fitness for a particular purpose is akin to the warranty of merchantability, but applies only when a buyer specifies a use for the product "which is peculiar to the nature of his business." Mass Gen. Laws ch. 106, § 2-315 cmt. 2; *see Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 35-36 (1987). The Evans contend that defendants breached their implied warranty of fitness for a particular purpose because the HVAC system was used to heat and cool "their rather unique property: a four-story, 10,799 square-foot home." Opp'n (Dkt # 72) at 11. That assertion fails as a matter of law. *See Laspesa v. Arrow Int'l, Inc.*, 2009 WL 5217030, at *4 (D. Mass. 2009) ("When the buyer plans to use the product for its ordinary purpose, the only implied warranty is the warranty of merchantability . . . ."). Since it is undisputed that an HVAC system is used to heat and cool a home and the Evans used it for that very purpose, they cannot claim a breach of the implied warranty of fitness. *See Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821 (1982) (finding no breach under § 2-315 where a buyer used the swimming pool for no purpose other than to swim).

***Negligent and Intentional Misrepresentation***

To sustain a claim of misrepresentation, "a plaintiff must prove 1) the defendant made a false statement of a material fact, 2) to induce the plaintiff to act thereon and 3) the plaintiff reasonably relied on the statement to his detriment." *Ruggers, Inc. v. U.S. Rugby Football Union, Ltd.*, 843 F. Supp. 2d 139, 145-146 (D. Mass. 2012), citing *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991). To support a negligent misrepresentation claim, the plaintiff must show that the defendant failed "to exercise reasonable care or competence in obtaining or communicating the information." *Nota Const. Corp. v. Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 20 (1998). For an intentional misrepresentation claim, the plaintiff must show that the defendant knew that the statement was false when made. *Zuckerman v. McDonald's Corp.*, 35 F. Supp. 2d 135, 144 (D. Mass. 1999).

To satisfy the reliance element, the Evans allege that they relied on Daikin's statements that the HVAC system could "address any design challenge," "be installed practically anywhere" and "seamlessly crafted into any design," and "perform flawlessly in any climate," with assured reliability and "constant operation." NSOF (Dkt # 73) ¶¶ 67, 69, 73, 76. The Daikin literature did not, however, warn about installation near drywall or note the

need for ductwork.[18] The Evans contend that these representations were materially false because defendants now claim that the coils cannot be safely installed around drywall or without ducting. They also assert that the representation that a homeowner could "control each room individually . . . [and] even shut down operations in zones or rooms that are not in use," *id.* ¶ 77, was materially false because they had to independently hire NECT to install shut-off values to achieve that feature.

Having previously concluded that only DACA, not Daikin NA or Daikin AA, made the alleged representations, only DACA Trust can be held liable. DACA Trust, in turn, argues that these statements are not misrepresentations but mere puffery. *See Saint Consulting Grp., Inc. v. E. Ins. Grp., LLC*, 2015 WL 2062202, at *12 (Mass. Super. 2015) ("[P]romises to provide a 'superior' insurance program for [plaintiff] and to do 'an outstanding job" for all of [plaintiff's] insurance needs are common 'puffery . . . .'"); *Gemini Inv'rs, Inc. v. Ches-Mont Disposal, LLC*, 629 F. Supp. 2d 163, 169 (D. Mass. 2009) ("[Plaintiff's] sales pitch with respect to its superior 'skill sets' is no more than comparable corporate puffery."); *Greenery Rehab. Grp., Inc. v. Antaramian*, 36 Mass. App. Ct. 73, 75 (1994)

---

[18] The installation manual provides that the coils should not be installed "[w]here corrosive gas, such as sulfurous acid gas, is produced." NSOF (Dkt # 62) ¶ 30.

(noting that the statements "solid" and "good as gold" are "so general as to amount to puffery"). Puffery "'is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely.'" *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 38 (1st Cir. 2000) (citation omitted). But whether these statements are material misrepresentations or mere puffery is a question of fact for the jury, for it cannot be said that they "'are so obviously unimportant . . . that reasonable minds cannot differ on the question of materiality.'" *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 58 (2004) (citation omitted).

DACA Trust also disputes the Evans's reliance on the alleged misrepresentations. The Evans testified that, to the best of their recollection, they did not recall visiting a Daikin website or communicating with a Daikin-named entity. ASOF (Dkt # 53) ¶¶ 12-15. The Evans purchased the HVAC system primarily based on the recommendation of their engineer Allied, which had described the Daikin system as "a superior system to Mitsubishi . . . [that] is more efficient and provides a higher [seasonal energy efficiency ratio]." NSOF (Dkt # 62) ¶ 43. Bruce Evans specifically recalls Allied stating that "the Daikin system would be well suited for [his] home." *Id.* ¶ 39. However, Bruce Evans also testified that he relied, in part, on the Daikin literature in deciding to purchase the Daikin HVAC system. NSOF

19

(Dkt # 73) ¶ 61. Whether the Evans reasonably relied on these alleged misrepresentations is similarly a question of fact for the jury. *See Marram*, 442 Mass. at 59 ("Reliance normally is a question for a jury."); *Nota Const. Corp.*, 45 Mass. App. Ct. at 20 ("A claim for negligent misrepresentation is ordinarily one for a jury, unless the undisputed facts are so clear as to permit only one conclusion.").

## ORDER

For the foregoing reasons, Daikin AA and Daikin NA's motions for summary judgment on all counts are <u>ALLOWED</u>. DACA Trust's motion for summary judgment is <u>ALLOWED</u> in part with respect to Count I claims of breach of express warranty and breach of implied warranty of fitness for a particular purpose, but is otherwise <u>DENIED</u>. The Clerk will enter judgment for Daikin AA and Daikin NA on all claims, and set the remainder of the case for trial to a jury.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE